UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| HENRY A. KOSZARSKY, | ) | Civil Action No.: 4:12-0939-RBH-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| A.O. SMITH CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

This employment discrimination case arises out of Plaintiff's employment with Defendant. Plaintiff alleges violations of the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601, et seq. and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, et seq. Presently before the Court is Defendant's Motion for Summary Judgment (Document # 33).  All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC.  Because this is a dispositive motion, this Report and Recommendation is entered for review by the district judge.

## II.    FACTS

Defendant A.O. Smith Corporation (A.O. Smith or the Company) manufactures water heaters.  Plaintiff began working for the Company as an electronics engineer on July 31, 2003. Pl. Answers to Def. First Request to Admit # 1 (Ex. A to Def. Motion). Upon his hire, he was provided a copy of the Company's Disability Policy, which noted its commitment to non-discrimination on the basis of disability and reasonable accommodations in the workplace.  Disability Policy (Ex. B to Def. Motion).  Plaintiff also received the Company's Equal Employment Opportunity Policy

during his orientation. EEO Policy (Ex. C to Def. Motion). Plaintiff also received information about the Company's Integrity Help Line, which provides employees with a confidential resource available 24 hours a day with specialists trained to respond to any employee concerns. Integrity Help Line Info. (Ex. D to Def. Motion). Plaintiff acknowledged that (1) he had received these policies, (2) the policies were explained to him by A. O. Smith, (3) he understood it was his responsibility to be familiar with the policies, and (4) he was encouraged to ask questions about these policies. A. O. Smith Salary Orientation (Ex. E to Def. Motion). Plaintiff concedes that he never raised any questions regarding A. O. Smith's policies nor did he ever contact the Integrity Help Line. Pl. Dep. p. 85 (Ex. F to Def. Motion).

In March 2008, Plaintiff's title changed from Electronics Engineer to Project Engineer. Count Aff. ¶ 5 (Ex. G to Def. Motion); Pl. Answers to Def. First Request to Admit # 2. During his employment with A. O. Smith, Plaintiff regularly received salary increases and average performance evaluations. Pl. Dep. p. 64. On July 1, 2009, A. O. Smith restructured its operations and moved Plaintiff and another employee from the Standard Commercial and Boiler Group to the Division Electronics Control Group led by Andy Phillips. Count Aff. ¶ 9. In July 2010, A. O. Smith created a new supervisory position filled by Carl McDow and moved Plaintiff under Mr. McDow's direct supervision, while Mr. Phillips continued to provide departmental oversight. This was the same management structure at the time of Plaintiff's termination.

In December 2008, Plaintiff's supervisor at the time, Sham Kassab, contacted the Company's Human Resources Manager, Chris Count, to investigate an incident in which Plaintiff engaged in unprofessional and disruptive behavior during a departmental meeting. Count Aff. ¶ 7. Specifically, Plaintiff continually disrupted the meeting by raising topics unrelated to the subject of the meeting and

accusing the management team of poorly managing a project. Email Dated December 15, 2008 (Ex. H to Def. Motion). Mr. Kassab told Plaintiff that he had already consumed ten minutes of the meeting and to stop talking. Id. Plaintiff stood up and yelled at Mr. Kassab claiming that he was telling him to leave the meeting. Id. Mr. Kassab responded that he had not told him to leave the meeting, but Plaintiff interrupted by yelling "the hell you did" and stormed out of the meeting. Id. Mr. Count conducted an investigation into Plaintiff's behavior during the departmental meeting and prepared a disciplinary notice to be placed in Plaintiff's personnel file. Count Aff. ¶ 7.

When Mr. Count met with Plaintiff regarding the incident, Plaintiff refused to sign the disciplinary notice. Id. After refusing to sign the disciplinary notice, Plaintiff informed Mr. Count on December 15, 2008, that he was resigning his employment effective immediately. Count Aff. ¶ 8; Pl. Answers to Def. First Request to Admit # 3. A day or two later, Plaintiff called Mr. Count to say that he had made a mistake in resigning his position and asked Mr. Count to speak with Mr. Kassab and other members of management to see if he could get his job back. Count ¶ 8; Pl. Answers to Def. First Request to Admit # 4. The Company permitted Plaintiff to return to work. Count Aff. ¶ 8; Pl. Answers to Def. First Request to Admit # 4; Pl. Dep. p. 28. Plaintiff agreed that his behavior was inappropriate and apologized to the A. O. Smith management team. Pl. Dep. p. 31.

In summer 2010, Plaintiff began reporting to Mr. McDow. McDow Dep. p. 36. McDow was aware that Plaintiff had suffered from depression in the past. McDow Dep. p. 58. In January 2011, Plaintiff sent an email to Mr. McDow, in which he questioned whether Mr. McDow and Mr. Phillips "were now dictators" and admonished Mr. McDow for handling a project differently than the way he believed it should be handled. Email dated January 9, 2011 (Ex. I to Def. Motion). Mr. McDow consulted with Mr. Count regarding strategies for responding to Plaintiff, and Mr. Count recommended

that Mr. McDow and Plaintiff go to lunch to discuss the email and his expectations regarding Plaintiff's professionalism and cooperative behavior. Count Aff. ¶ 10.

In mid-March 2011, the Company directed Plaintiff to travel to Milwaukee, Wisconsin to work on an emergency job site. Pl. Dep. p. 68-70; Count Aff. ¶ 11. Prior to approaching Plaintiff, the Company approached another employee about traveling to Milwaukee, but the employee declined to go because of previous commitments. McDow Dep. pp. 42-43. Plaintiff also declined to travel to Milwaukee to address the emergency matter and the Company sent another employee to handle the work. Count Aff. ¶ 11. Plaintiff did not provide any reason for declining to comply with the Company's direction. Count Aff. ¶ 11. Mr. McDow felt Plaintiff's refusal to go was a continuation of "the January incident." McDow Dep. p. 44. Mr. Count asked Mr. Phillips and Mr. McDow to leave the room so he could speak privately with Plaintiff. Id. Mr. Count told Plaintiff that his refusal would result in a write up in his personnel file. Id. By email dated March 13, 2011, Plaintiff expressed his intent to apologize for his behavior, noting "that was an inappropriate response by me and [Mr. Phillips] deserves more respect than that." Email Dated March 13, 2011 (Ex. J to Def. Motion). On March 14, 2011, Mr. Phillips issued a written warning to Plaintiff for his uncooperative and unprofessional behavior that concluded with the admonition that should any such behavior occur again, "further disciplinary action will be taken, up to and including discharge." Written Warning (Ex. K to Def. Motion); Pl. Dep. p. 84. Additionally, Mr. Count met with Plaintiff and instructed him that "further unacceptable behavior could result in disciplinary action up to and including termination of employment." Count Aff. ¶ 12.

Around this same time, Plaintiff began to exhibit behavior which others found to be unusual. Mr. McDow testifies that Plaintiff walked into his office "a couple of times and started some rambling

conversations" that did not pertain to work. He had never done this before and Mr. McDow believed this behavior to be unusual. McDow Dep. pp.46,47. Mr. McDow reached out to Mr. Count about Plaintiff's behavior. McDow Dep. p. 48. He emailed a detailed account of Plaintiff's behavior from March 24-25, 2011, and expressed concern about Plaintiff's need for the employee assistance program. McDow Email Dated March 25, 2011 (Ex. C to Pl. Response). Among other things, Mr. McDow informed Mr. Count that Plaintiff approached him on March 24, 2011, and said he had been feeling stressed. Plaintiff mentioned wanting counseling and that he planned to call his family physician to make an appointment. Plaintiff indicated that he was diagnosed as bipolar years ago and is on anti-depression medication. Then, on March 25, 2011, Plaintiff told Mr. McDow that he did not think he needed to make a doctor's appointment after all. Mr. McDow still thought Plaintiff seemed down that morning and stated "I am concerned about [Plaintiff] as an employee and a person but I am certainly not qualified to help him in any other way than pointing him toward available resources." Id.

In addition, on April 5, 2011, Cynthia Chacon, Plaintiff's co-worker, emailed Count that Plaintiff had been acting "strange lately," and she provided details of Plaintiff's disruptive conversations and lack of focus. She states "It should be understood that this is not normal behavior for [Plaintiff]" and "I have witnessed this type of behavior in [Plaintiff] in a milder form off and on for about a month and it has increasingly gotten worse." Chacon Email Dated April 5, 2011 (Ex. E to Pl. Response).[1]

---

[1]Plaintiff also submits an email he sent to Count on March 13, 2011, in which he informs Count that "Andy" and "Sham" were discussing Plaintiff drinking at dinner with a vendor and that perhaps his behavior could be explained by his consumption of alcohol combined with his medication. Pl. Email Dated March 13, 2011 (Ex. B to Pl. Response). Plaintiff explained in the email that he takes "a small dose of anti-depressant" and that his "depression in under control." Id.

In March of 2011, Mr. McDow scheduled mandatory training with UL, LLC (UL).[2] The mandatory training was to be provided by UL officials on-site at A. O. Smith. McDow Email dated March 7, 2011 (Ex. L to Def. Motion). The training was mandatory for all engineers because A. O. Smith is required meet certain standards and guidelines published by UL in order to sell its products. Pl. Dep. p. 90; McDow Dep. p. 74 (Ex. M to Def. Motion). As well, the UL training involved reviewing the equipment Plaintiff used and running various safety-related tests. Pl. Dep. p. 91. Plaintiff knew that the Company valued UL safety approval of its products because, as he testified, "before you could even sell it out in the field you need UL approval …[because] it shows that the product has been tested and the product is safe." Pl. Dep. p. 90. Plaintiff knew about the mandatory training at least one month in advance and he supported the training. Pl. Dep. p. 94-95.

On March 7, 2011, Mr. McDow emailed the engineering group, including Plaintiff, to notify them of the mandatory UL training on April 6 and 7, 2011. McDow Email Dated March 7, 2011; Pl. Answers to Def. First Request to Admit # 15. In the email, Mr. McDow notified the group that they should plan for a full day attendance both days. Id. At the end of March 2011, Plaintiff told Mr. McDow that he planned to take vacation on April 6 and 7, 2011 because he was having new granite countertops installed in his home.[3] Pl. Answers to Def. First Request to Admit # 16;[4] McDow Dep.

---

[2] UL, LLC (Underwriters Laboratories) is a global independent safety science company that specializes in offering safety solutions and promoting public adoption of sustainable and renewable electricity. UL certifies, validates, tests, inspects, audits and advises companies regarding the operation of products sold by A. O. Smith. See http://www.ul.com

[3] The granite countertops were actually installed on April 5, 2011. Receipt (Ex. D to Pl. Response).

[4] During his deposition, Plaintiff testified that all responses to Defendant's First Request to Admit are true to the best of his knowledge. Pl. Dep. p. 13. However, later in his deposition he contradicted the responses he provided to Defendant's First Request to Admit in several instances, including his recollection of the installation of granite countertops in his kitchen and his requests

p. 61; Pl. Response to Motion for Summary Judgment p. 3.   Mr. McDow denied Plaintiff's request

for vacation on April 6 and 7, 2011, and reminded him that his attendance was required at the

mandatory training scheduled for those two days. Pl. Answers to Def. First Request to Admit # 17;

McDow Dep. p. 61. Mr. McDow did approve Plaintiff's request for vacation on Friday, April 8, 2011.

Pl. Answers to Def. First Request to Admit # 18.

      Plaintiff again asked Mr. McDow on April 5, 2011 if he could take vacation on April 6 and 7.

Mr. McDow denied his request, reminding him of the mandatory UL training.  Pl. Answers to Def.

First Request to Admit # 19; McDow Dep. p. 61; Pl. Response to Motion for Summary Judgment p.

3.  Again, at 4:23 a.m. on the morning of the UL training session (April 6, 2011), Plaintiff sent Mr.

McDow an email requesting "Additional Vacation Days" for April 6 and 7, 2011.   Pl. Email Dated

April 6, 2011 (Ex. N to Def. Motion); Pl. Answers to Def. First Request to Admit # 20. Mr. McDow

emailed Plaintiff back and once again denied his request for vacation on April 6 and 7, 2011.   Mr.

McDow's email provides:

> Today and tomorrow are the UL1998 training that has been on the calendar for a
> month and we discussed the need for you to be here.
>
> I previously approved your request for Friday, April 8, but specifically did not approve
> the 6th and 7th. We talked about this more than once even as recently as yesterday.
>
> I need you to offer some explanation for this last minute email.

<u>Id.</u>  In response, Plaintiff stated "stress, need to unwind." <u>Id.</u>  Plaintiff did not report to work on April

---

for vacation prior to April 6 and 7, 2011.  Pl. Dep. pp. 95-97.  Matters admitted under Rule 36,
Fed.R.Civ.P., are conclusively established.  Depositions cannot refute admissions under Rule 36.
<u>See</u> <u>Praetorian Ins. Co. v. Site Inspection, LLC</u>, 604 F3d 509, 514 (8th Cir. 2010) (citing  United
States v. Kasuboski, 834 F.2d 1345, 1350 (7th Cir.1987)); <u>see</u> <u>also</u> <u>Barwick v. Celotex Corp.</u>, 736
F.2d 946, 960 (4th Cir.1984) ("A genuine issue of material fact is not created where the only issue
of fact is to determine which of the two conflicting versions of the plaintiff's testimony is
correct.").

6 and 7, 2011, and he skipped the mandatory UL training.  Pl. Answers to Def. First Request to Admit

# 22.  Plaintiff was the only employee not present for the mandatory UL training.  McDow Dep. p. 74.

McDow testifies that, on his way into work the morning of April 6, 2011, he contacted Mr. Phillips

and Mr. Count and informed them that Plaintiff was not coming into work and he believed Plaintiff

was just making an excuse for missing work that day.  McDow Dep. p. 63.

On the morning of April 7, 2011, Mr. McDow recommended that Plaintiff be terminated for

unauthorized absences on April 6 and 7, 2011.  McDow Dep. p. 26-27. Mr. McDow met with Mr.

Phillips and Mr. Count regarding Plaintiff's employment status and they made the decision to terminate

his employment.  McDow Dep. p. 25-26; Count Aff. ¶ 17. The reason for the termination was

Plaintiff's uncooperative behavior in failing to report to work for the mandatory training on April 6

and 7, 2011, and for taking unauthorized vacation on both days. Id.  McDow believed Plaintiff's

absence on the mandatory training day was "a continuation of the previous two incidents of

insubordination that he wanted the day off and he was going to take the day off." McDow Dep. p. 60.

They called Plaintiff at home and asked him to come into the office to discuss his unauthorized

absences and employment status.  Count Aff. ¶ 19; McDow Dep. p. 28- 29. When Plaintiff indicated

he would not come to the office, Mr. Phillips told Plaintiff that his employment was terminated

effective that day, April 7, 2011, for his unauthorized absences on April 6 and 7, 2011.  Id.  After

Plaintiff was told that he was terminated, his wife got on the phone and reported that he had suffered

an anxiety attack the prior day.  Id.; McDow Dep. p. 31.

Plaintiff admits that he never sought FMLA benefits prior to April 7, 2011, he never requested

an accommodation prior to April 7, 2011, he never mentioned a medical condition to anyone at A. O.

Smith prior to April 7, 2011, and he was capable of performing his job responsibilities at A. O. Smith

without accommodation prior to April 7, 2011.   Pl. Dep. pp. 38, 89-90, 105-06, 124, 143.

Further, Plaintiff's wife admitted in her deposition that her husband's medical condition never reached enough of a concern for her to call A. O. Smith or Mr. Count before he was terminated.  Mrs. Koszarsky Dep. p. 33 (Ex. O to Def. Motion). As well, Mrs. Koszarsky admitted that neither she nor her husband mentioned anything about FMLA leave or requesting an accommodation during the April 7, 2011 telephone call until after Plaintiff had been informed that his employment was terminated for failing to attend the mandatory UL training.  Mrs. Koszarsky Dep. pp. 36, 40. Plaintiff testified that he did not believe he had any medical condition prior to his termination on April 7, 2011.  Pl. Dep. p. 110.

Mr. McDow testified that he would not have recommended termination if he had known Plaintiff was legitimately sick.  McDow Dep. p. 69.  After A. O. Smith management informed Plaintiff of his termination of employment, and first heard about his alleged medical issue, the Company sent him FMLA paperwork for his doctor to complete and told Plaintiff that they would review the termination decision if the April 6, 2011, absence was supported by medical documentation.  Count Aff. ¶ 22; Pl. Dep. pp. 115-116. A. O. Smith provided Plaintiff with the FMLA medical certification form for his doctor to complete, and Plaintiff returned the form on May 7, 2011.  FMLA Form (Ex. P to Def. Motion).  However, the completed FMLA form did not cover April 6, 2011.  Id.; Pl. Dep. pp. 119-122. Rather, it provided that Plaintiff's condition commenced on April 7, 2011, and listed three treatment dates– April 8, 14 & 21.  FMLA Form.[5]  There was no supporting documentation for the April 6, 2011, absence.  Id.  Based on the information provided by Plaintiff, A. O. Smith upheld

_____

[5]A staff member for the physician who completed Plaintiff's FMLA paperwork told him not to return to the physician's office for medical treatment because she believed he was improperly seeking Xanax.  Pl. Dep. pp. 121-122.

the termination of his employment, as documented in a letter dated May 19, 2011. Letter Upholding Termination (Ex. Q to Def. Motion).

Plaintiff applied for and was hired to work at Zurn Industries beginning in November 2011, earning the same salary and benefits. Pl. Dep. pp. 56-58. However, he was unable to remain employed there after suffering "relapse of depression on return to work requiring medication adjustment and monitoring." Physician Statement(Ex. L to Pl. Response). He went to the emergency room on January 15, 2012, after describing to his wife his suicide plans. Mrs. Koszarsky Dep. p 54. He was admitted to the Behavioral Mental Health Facility in Darlington on January 16, 2012, and released in January 23, 2012. Mrs. Koszarsky Dep. p 56. In June 2012, Plaintiff attempted electric shock therapy. Mrs. Koszarsky Dep. pp 60-61. On December 15, 2012, the Social Security Administration determined that Plaintiff became disabled under their rules on May 11, 2012. Social Security Decision (Ex. N to Pl. Response).

## III.    STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party

must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324. Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## IV.     DISCUSSION

### A.     ADA

Plaintiff alleges that Defendant violated the ADA by failing to accommodate Plaintiff's disability by allowing him time off, passing him over for a promotion because of his disability and discharging him because of his disability. The ADA provides:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). The ADA places an affirmative obligation on employers to make reasonable accommodations for qualified individuals if such accommodation will enable the employee to successfully perform the job in question. 42 U.S.C. § 12111(8). Violations of the ADA occur when the employer either wrongfully discharges a qualified individual with a disability or fails to make reasonable accommodations for him. Rhoads v. F.D.I.C., 257 F.3d 373, 387 n. 11 (4th Cir.2001).

The Fourth Circuit has held that the causation and burden-shifting standards applicable in Title VII cases as set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)[6] are also applicable in cases brought pursuant to the ADA "where the defendant disavows any reliance on discriminatory reasons for its adverse employment action." Ennis v. Nat'l Assoc. Of Business and Educ. Radio, 53 F.3d 55, 58 (4th Cir.1995). Under the analysis set forth in McDonnell Douglas, Plaintiff has the initial burden of demonstrating a prima facie case of discrimination. Bryant v. Bell Atlantic Maryland, Inc., 288 F.3d 124, 133 (4th Cir. 2002). If Plaintiff establishes a prima facie case, the burden shifts to Defendant to produce a legitimate, nondiscriminatory reason for the Plaintiff's discharge. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). Once Defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination vel non." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)(citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)). In other

---

[6]The McDonnell Douglas analysis was refined in St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), and Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reason, but was pretext for discrimination. Reeves, 530 U.S. at 143.

### 1. Failure to Accommodate

Plaintiff alleges that he requested time off on April 6 and 7, 2011, for "stress" and that Defendant's refusal to grant the time off amounted to a failure to accommodate his alleged disability. "In a failure to accommodate case, a plaintiff establishes a prima facie case by showing '(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . . ; and (4) that the [employer] refused to make such accommodations.'" Rhoads, 257 F.3d at 387 n. 11 (quoting Mitchell v. Washingtonville Ctr. Sch. Dist., 190 F.3d 1, 6 (2d Cir.1999)).

Defendant argues that Plaintiff fails to show that he was disabled on April 6, 2011, that he provided notice to Defendant of his alleged disability or his need for an accommodation prior to April 6, 2011, or that he could perform the essential functions of his position with the reasonable accommodation.

For purposes of the ADA, a person is disabled when he has "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) [is] ... regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)-(C). Depression and anxiety are impairments recognized by the ADA. See, e.g., Baird ex rel. Baird v. Rose, 192 F.3d 462, 467 n. 3 (4th Cir.1999); Rohan v. Networks Presentations LLC, 175 F.Supp.2d 806, 812 (D.Md.2001); Dean v. Westchester Co. P.R.C., 309 F.Supp.2d 587, 593 (S.D.N.Y.2004); Battle v. United Parcel Service, Inc., 438 F.3d 856, 861–62 (8th Cir.2006).

However, "a medical diagnosis of depression is not the 'sin[e] qua non' of having an ADA disability," Dean, 309 F.Supp.2d at 593, and alleging the existence of an impairment "without showings of substantial limitation to major life activities would not qualify Plaintiff as disabled." Lipscomb v. Techs., Servs. & Info., Inc., No. DKC 09–3344, 2011 WL 691605, at * 12 (D.Md. Feb. 18, 2011); see also Dunbar v. Byars, No. 2:11-cv-2243-JFA-BHH, 2013 WL 667930, *3 (D.S.C. January 30, 2013).

The record reveals that Plaintiff was taking anti-depressant medication prior to April 6, 2011. In addition, a letter from Plaintiff's health care provider dated April 7, 2011, indicates that she has diagnosed him with Generalized Anxiety Disorder with panic disorder and that his condition has caused physical symptoms such as difficultly with sleep, headaches, and digestive problems. Health Care Letter Dated April 7, 2011 (Ex. G to Pl. Response). The letter further provides that Plaintiff "has had a history of anxiety for which he has taken medication and received occasional counseling." Id.

However, as stated above, an impairment without substantial limitation to a major life activity is insufficient to qualify as a disability. Although the ADA does not define "major life activities," the Fourth Circuit interprets them to be "activities that are of central importance to daily life" and "that the average person in the general population can perform with little or no difficulty." Rohan v. Networks Presentations, LLC, 375 F.3d 266, 274 (4th Cir.2004). The regulations provide a non-exhaustive list of major life activities, including "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Plaintiff fails to point to a major life activity in which he was substantially

limited.[7] Plaintiff testifies that he had no problems seeing, hearing, talking, sitting, standing, playing golf, walking the dog, playing with animals, going to the beach, doing yard work, weeding and trimming. Pl. Dep. pp. 40-41. He also testifies that he was able to perform his job, follow directions, complete tasks, and go to work. Pl. Dep. pp. 89-90. Thus, without a substantial limitation to a major life activity, Plaintiff fails to show that he had a disability as recognized by the ADA at the time he was employed by Defendant.

In sum, Plaintiff fails to present sufficient evidence to establish a prima facie case of failure to accommodate because he fails to show he had a disability as defined by the ADA.

## 2. Failure to Promote

Plaintiff only briefly addresses this claim in his Response. In his Complaint, he alleges that Defendant believed he had a mental problem that disqualified him from promotions. Complaint ¶ 9. Plaintiff believed that his supervisors declined to consider him for promotions to manager, including the one eventually given to Mr. McDow, because of his change in behavior, which he believed they attributed to him combining alcohol and his anti-depressant medication. Pl. Email Dated March 12, 2011. To establish a discriminatory failure to promote claim, Plaintiff must show that: (1) he is a member of a protected group; (2) he applied for a specific position; (3) he was qualified for the position; and (4) he was rejected "under circumstances that give rise to an inference of discrimination." Williams v. Giant Food, Inc., 370 F.3d 423, 430 (4th Cir. 2004).

For the same reasons discussed with Plaintiff's failure to accommodate claim, Defendant argues that Plaintiff was not a member of a protected group because he was not disabled as defined by

_____

[7]In fact, Plaintiff does not even address this requirement in his Response.

the ADA.  The court agrees for the same reasons discussed above.  In addition, Defendant argues that,

even if Plaintiff did have a disability, it is undisputed that he never applied for any promotion.  Pl. Dep.

pp. 34, 67, 76-77.  Although Plaintiff refers to "promotions" in his Complaint, the only promotion he

identifies is the one given to Mr. McDow.  Plaintiff argues that Mr. McDow did not apply for the

managerial position he obtained, either, but was approached and asked if he wanted the job, which had

never actually been posted.  McDow Dep. pp. 9, 11.  Thus, Plaintiff argues that his failure to apply for

a promotion should not preclude his failure to promote claim.  Nevertheless, Plaintiff fails to present

evidence that his supervisors were aware that he was interested in the promotion to a managerial

position given to Mr. McDow.  To the contrary, in an email to Mr. Count, Plaintiff asserts "Carl

[McDow] is an excellent manager and at the time of his promotion I did not even consider wanting that

position." Pl. Email Dated March 13, 2011 (Ex. J to Def. Motion).  Although this same email indicates

Plaintiff's desire for a future managerial position, there is no evidence in the record that any such

positions became available between the date of the email and Plaintiff's termination.  Furthermore,

because there is no evidence that Plaintiff applied for or even made known that he was interested in

the managerial position obtained by Mr. McDow, he also fails to meet the fourth prong, which requires

a showing that he was rejected for the position under circumstances giving rise to an inference of

discrimination.  Accordingly, Plaintiff's failure to promote claim is without merit.

### 3.       Unlawful Discharge

Plaintiff also alleges that his employment was terminated because of his disability.  To establish

a prima facie case of discriminatory discharge under the ADA, a plaintiff must show that (1) he was

a "qualified individual with a disability;" (2) he was discharged; (3) he was fulfilling his employer's

legitimate expectations at the time of discharge; and (4) the circumstances of his discharge raise a

reasonable inference of unlawful discrimination. <u>Haulbrook v. Michelin N. Am., Inc.</u>, 252 F.3d 696, 702 (4th Cir.2001).

Defendant does not dispute that Plaintiff was discharged and that he was fulfilling his employer's legitimate expectations at the time of his discharge. However, as discussed above, Defendant argues that Plaintiff did not have a disability nor was he discharged under circumstances that raise a reasonable inference of unlawful discrimination. Again, as discussed with respect to Plaintiff's failure to accommodate claim, Plaintiff fails to show that he had an impairment that substantially limited a major life activity and, thus, fails to show that he was disabled as defined by the ADA at the time of his discharge. Furthermore, even if Plaintiff did have a disability, Defendant's lack of notice of the disability precludes an inference of discrimination with respect to his termination.

In sum, Plaintiff's failure to present sufficient evidence to show that he had a disability, that is, an impairment that limited one or more of his major life activities, is fatal to all of his ADA claims. Furthermore, even if Plaintiff did have a disability, the absence of sufficient evidence that Defendant was aware of a disability precludes any inference that Plaintiff suffered any adverse employment action (whether it be a failure to accommodate, a failure to promote, or termination) because of his disability. Therefore, summary judgment is appropriate on Plaintiff's ADA claims.

## B. FMLA

Plaintiff also alleges that Defendant terminated his employment in violation of the FMLA. The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1). The FMLA also prohibits an employer from discriminating against an employee for asserting rights under

the Act. 29 U.S.C. § 2165(a)(2). "The FMLA creates two types of claims: (1) interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act; and (2) retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." Gleaton v. Monumental Life Ins. Co., 719 F.Supp.2d 623, 633 n. 3 (D.S.C.2010) (internal citation omitted). In his Complaint, Plaintiff alleges both interference and retaliation claims. Complaint ¶¶ 16-32. However, in his Response, Plaintiff addresses only the interference claim. Thus, Plaintiff appears to have abandoned the retaliation claim.[8]

To establish a case of FMLA interference, Plaintiff must show that: (1) he was an eligible employee; (2) his employer was covered by the FMLA; (3) he was entitled to FMLA leave; (4) he gave his employer adequate notice of his intention to take leave; and (5) his employer denied him the benefits to which he was entitled. Rodriguez v. Smithfield Packing Co., 545 F.Supp.2d 508, 516 (D.Md. 2008) (citing Edgar v. JAC Prods., Inc., 443 F.3d 501, 507 (6th Cir. 2006)). Defendant argues that Plaintiff was not entitled to FMLA leave nor did he give his employer adequate notice of his intention to take leave.

Under the FMLA, an employee is entitled to a total of twelve weeks of leave during any

---

[8]Even if Plaintiff has not abandoned his retaliation claim under the FMLA, such a claim fails. Retaliation claims under the FMLA are evaluated under the McDonnell Douglas burden-shifting framework. Perry V. Computer Sciences Corp., 429 Fed.Appx. 218, 221 (4th Cir. 2011). To establish a prima facie case of retaliation under the FMLA, Plaintiff must show (1) he engaged in protected activity, (2) the employer took adverse action against him, and (3) the adverse action was causally connected to the plaintiff's protected activity. Yashenko v. Harrah's N.C. Casino Co., LLC, 446 F.3d 541, 551 (4th Cir.2006) (citing Cline v. Wal–Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir.1998)). It is undisputed that Plaintiff did not request FMLA leave prior to his termination on April 7, 2011. Thus, Plaintiff cannot show a causal connection between his termination and his protected activity.

twelve-month period because of a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). "The term 'serious health condition' means an illness, injury, impairment, or physical or mental condition that involves--(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). Here, it is undisputed that Plaintiff did not receive inpatient treatment for his condition, so the question before the Court is whether he received "continuing treatment by a health care provider." The FMLA regulations describe what is meant by continuing treatment:

> [a] serious health condition involving continuing treatment by a health care provider includes any one or more of the following:
>
>> (a) Incapacity and treatment. A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
>>
>> (1) Treatment two or more times, within 30 days of the first day of incapacity, unless extenuating circumstances exist, by a health care provider, by a nurse under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or
>>
>> (2) Treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.115(a).[9]

Here, the evidence in the record reveals a health condition, described as a "nervous breakdown" commenced on April 7, 2011, and he was seen three more times within thirty days of

---

[9]Subsections (b)-(e) of 29 C.F.R. § 825.115 list other situations that may be considered continuing treatment by a health care provider. However, those situations are not relevant to this case.

the first day of incapacity. FMLA Form. Defendant argues that there is no evidence that Plaintiff was incapacitated for more than three consecutive, full calendar days. However, Plaintiff's healthcare provider indicated that his health condition had a probable duration through May 16, 2011. FMLA Form. Although the form does not specifically identify this time period (between April 7, 2011, and May 16, 2011) as a "period of incapacity" the information is at least sufficient to create an issue of fact as to whether Plaintiff was incapacitated for more than three consecutive, full calendar days.

However, the crux of Defendant's argument and the reason that his termination was upheld is that Plaintiff was out on April 6, 2011, and the medical documentation provides that the onset of Plaintiff's illness was April 7, 2011, and, thus, at the time of his unexcused absence and termination of employment, he was not suffering from a serious health condition that would entitle him to FMLA leave. Instead, Defendant argues, the events leading up to Plaintiff's absence from the mandatory training on April 6, 2011, are indicative of Plaintiff's intent to take vacation days regardless of whether they were approved by his supervisor. The evidence in the record indicates that Plaintiff requested to take vacation days on April 6 and 7, 2011, on at least two occasions prior to those dates. Furthermore, in the early morning hours of April 6, 2011, Plaintiff emailed Mr. McDow and again asked for vacation days, not sick leave, on April 6 and 7, 2011. Plaintiff included no further content in his email and, only after Mr. McDow asked for some explanation of why he was again asking for vacation days after Mr. McDow had already denied the same request at least twice, did Plaintiff respond with a simple "stress, need to unwind." However, this response is insufficient to show that Plaintiff was suffering from a serious medical condition on April 6, 2011. Plaintiff argues that his unusual behavior in the days leading up to April 6, 2011, as witnessed by Mr. McDow and others,

indicates that he was suffering from a serious medical condition at that time. However, under the facts of this case, "stress" and "unusual behavior" are insufficient evidence of a serious medical condition. Thus, the only evidence in the record regarding a serious medical condition indicates that Plaintiff began to suffer from such a condition on April 7, 2011. Accordingly, Plaintiff fails to show he was entitled to FMLA leave on April 6, 2011, and Plaintiff's FMLA interference claim fails.

Because Plaintiff fails to establish a <u>prima</u> <u>facie</u> case of a failure to accommodate or of discrimination under the ADA or that he was entitled to leave under the FMLA, summary judgment is appropriate in this action.

## V.    CONCLUSION

For the reasons discussed above, it is recommended that Defendant's Motion for Summary Judgment (Document # 33) be granted and this case dismissed in its entirety.

 s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

October 30, 2013
Florence, South Carolina